Argued February 29, decided March 26, rehearing denied April 23, 1912.

## STATE OF OREGON *v.* SENGSTACKEN.

[122 Pac. 292.]

QUO WARRANTO—STATUTES.

1. Under Section 363, L. O. L., which abolishes writs of quo warranto and proceedings in the nature quo warranto, and provides that similar relief may be had by action at law, and Section 366, subd. 3, providing that an action at law may be maintained in the name of the State upon the information of the prosecuting attorney against persons acting as a corporation without being duly incorporated, the right to relief by action at law is analogous to the older methods.

JURY—RIGHT TO JURY TRIAL.

2. Under Article I, Section 17 of the Constitution, providing that in all civil cases the right of trial by jury shall remain inviolate, the protection to the right of trial by jury applies only to cases in which that right

existed at common law, was secured by statute, or recognized by decision or rule of court prior to the adoption of the constitution.

### QUO WARRANTO—DISTINGUISHED FROM "INFORMATION IN THE NATURE OF QUO WARRANTO."

3. The ancient writ of "quo warranto" was in the nature of a writ of rig,ht, invocable by the king against persons claiming or usurping an office or liberty, to inquire by what authority they asserted right thereto, and the judgment was conclusive even as against the crown, while a proceeding by "information in the nature of quo warranto" is properly a criminal prosecution instituted not only to fine the usurper, but to oust him from the office, franchise, or liberty.

### JURY—PROCEEDING—JURY TRIAL.

4. In view of St. 9 Ann. c. 20, providing that judgments of ouster and fine might be rendered in proceedings by information in the nature of quo warranto, and other acts specially providing that if issue were joined on such information jury process should be awarded, a jury trial was not allowable under the ancient writ of quo warranto, and of Article VII, Section 2 of the Constitution, as amended November 8, 1910, empowering the Supreme Court, which is not authorized to impanel a jury, to take original jurisdiction in quo warranto proceedings, a jury trial is not allowable in such proceedings, and hence findings of fact by the trial court in quo warranto do not have the effect of verdicts by the jury.

### QUO WARRANTO—PROCEEDING—JURY TRIAL.

5. In view of St. 9 Ann. c. 20, providing that, in proceedings by information in the nature of quo warranto, the judgment rendered may not only provide for ouster, but may also fine the respondent for his usurpations, Section 374, L. O. L., providing that, when any defendant against whom an action has been commenced for intruding into or unlawfully holding or exercising any office or franchise, the judgment shall be that defendant shall be excluded and the court may impose a fine, refers, not to the ancient writ of quo warranto, but to proceedings by information in the nature of quo warranto, while Section 371, providing that, if judgment be given upon the right of the person alleged to be entitled, he shall be entitled to the possession and enjoyment of such franchise, refers to the ancient writ of quo warranto.

### EVIDENCE—CONTEST—COMPETENCY.

6. In a contest over the validity of a special election, evidence that registered voters had removed from the district is competent; but mere statements of opinion that the registered voters who had left were greater in number than those who had come into the district is incompetent and will not support a finding of such fact.

### ELECTIONS—NOTICE—MODE.

7. The method of notice for special elections provided for by Section 6116, L. O. L., providing that notices shall be posted in each polling precinct as at general elections, is exclusive, and evidence of notice by newspapers is irrelevant.

---

Elections—Notice—Condition Precedent.

8. The giving of notice of special elections as required by Section 6116, L. O. L., is a condition precedent to the holding of a valid election.

Elections—Validity—Special Elections.

9. Where, from the number of votes cast at a special election, it appears by a comparison of the number of registered voters in the district that no different result was possible had all the voters participated in the election, the failure to comply with the statutory requirements, in respect to giving notice, will not invalidate the election; but where the statutory notice was not given, and it appeared that from the number of voters registered at the last general election a different result was possible had all voted, the election was invalid.

Elections—Notice—Number of Notices.

10. Under Sections 3305-3507, L. O. L., respectively providing for the appointment of three judges and three clerks for election for each precinct that an additional board may be appointed in precincts in which more than 150 votes are cast, and that it shall be the duty of the county clerk to prepare printed notices of elections and mail two to each judge and clerk, whose duty it shall be to immediately post the notices in public places in their precincts, where the district consisted of 12 precincts in 3 of which a second board had been appointed, 180 notices must be posted before a valid special election can be had.

Evidence—Contest—Presumptions.

11. Neither the clerks nor judges being required to make any return of the posting of election notices, it will be presumed that such notices were posted, under Section 799, L. O. L., subd. 15, recognizing the presumption of performance of official duties.

From Coos: John S. Coke, Judge.

Statement by Mr. Justice Moore.

This is an action in the name of the State upon the information of George M. Brown, the prosecuting attorney of the proper district, against Henry Sengstacken, E. Mingus, W. C. Harris, L. J. Simpson, and C. S. Winsor, to determine their rights to act as a corporation. The information details the proceedings undertaken to organize in Coos County, the port of Coos Bay, sets forth wherein certain requirements of the statute, respecting the giving of notice of a special election, were not observed whereby, it is alleged, the attempt to create a municipal corporation was ineffectual,

and the defendants are acting as commissioners without authority.

The answer and the reply put in issue the material allegations of the pleadings of the respective parties, and, the cause having been tried, findings of fact were made in substance as follows: That a proper petition, particularly describing the boundaries of the territory proposed to be incorporated, was duly filed and presented to the county court of that county, which ordered a special election to be held April 19, 1909, at the several polling places in the 12 precincts comprising the district. That in each of 3 of these precincts a second or additional board, consisting of 3 judges and 3 clerks, were regularly appointed. That, within the time prescribed, the county clerk caused to be printed and mailed to each of the judges and clerks of such precincts two notices of election. That the election was held on the day appointed, and, the returns thereof having been duly made and canvassed, there were found to have been cast 1,234 ballots, of which 992 were polled in favor of the incorporation and 221 against it. That thereupon the county court caused to be entered in its journal the results of the election and an order proclaiming the incorporation of the port of Coos Bay. That of the 180 notices of election required to be posted, there were put up in the several precincts, by the judges and clerks appointed therefor, only 105; that at their request there were posted by third parties 8, by other persons 9. That no evidence was offered as to the putting up of 14. That there was a neglect to post 44. That in the territory comprising the port the total number of electors registered for and the votes cast at several elections were respectively as follows: June, 1908, 1,788 and 1,917; November of that year, 2,002 and 1,672; November, 1910, 1,761 and 1,873. That of the total vote cast April 19, 1909, 309

ballots were polled by electors who had not been registered. That nine days prior to the election, actual notice thereof was regularly mailed to 1,764 registered voters residing in the district. That in five of the precincts public meetings were held to debate the question of the incorporation, which subject was also discussed in the public press of the district. And that between June, 1908, and April, 1909, there had been in the territory no increase of voters, the approximate number of whom was 1,950 at the time of the special election. Based on these findings, conclusions of law were deduced, in substance as follows: That the notices of election that were posted by persons other than judges and clerks afford adequate information; that it would be presumed that notices, in respect to posting which no evidence was offered, were regularly put up; that there was no reasonable probability that the failure to post the entire number of notices demanded would have affected the result of the election; that the putting up of every notice specified was not essential to the holding of a valid election; and that each step required to be taken was performed with sufficient regularity to incorporate the port and to authorize the defendants, as regularly selected commissioners, to act for it. Judgment was thereupon rendered, awarding to defendants their costs and disbursements, and the plaintiff appeals.

REVERSED.

For appellant there was a brief over the names of *Mr. George M. Brown,* Prosecuting Attorney, *Mr. L. A. Liljeqvist,* Deputy Prosecuting Attorney, with an oral argument by *Mr. Joseph W. Bennett.*

For respondent there was a brief and an oral argument by *Mr. Cassius R. Peck.*

MR. JUSTICE MOORE delivered the opinion of the court.

It is maintained by plaintiff's counsel that testimony was improperly admitted over objection and exception, that the findings of fact do not sustain the conclusions of law, and that errors were committed in these respects. It is insisted by defendants' counsel, however, that the cause having been tried without a jury, evidence was properly received upon which could have been predicated the findings of fact and of law which are sufficient to uphold the judgment and cannot be reviewed upon appeal.

1. Preliminary to a discussion of the question suggested, reference will be made to clauses of the statute upon which these proceedings are founded.

"An action at law may be maintained in the name of the State, upon the information of the prosecuting attorney, * * against the persons offending in the following cases: * * When any association or number of persons act within this State, as a corporation, without being duly incorporated." Section 366, L. O. L., subd. 3.

This enactment is a part of the chapter of the Code relating to actions to avoid charters, letters patent, and to prevent the usurpation of an office or franchise, and to determine the right thereto. Sections 363-377, L. O. L.:

"The writ of *scire facias,* the writ of *quo warranto,* and proceedings by information in the nature of *quo warranto* are abolished, and the remedies heretofore obtainable under these forms may be obtained by action at law in the mode prescribed in this chapter." Section 363, L. O. L.

Though the common-law forms of actions thus referred to have been changed, the right to the relief by actions analogous to those ancient methods remains. *State* v. *Douglas County Road Co.,* 10 Or. 198; *State ex rel.* v. *Cook,* 39 Or. 377 (65 Pac. 89). In this condition of the law, regulating the practice in *quo warranto* actions, the chief inquiry is: Could the parties hereto have legally insisted upon a trial by jury, so that waiving the right makes the findings of fact equivalent to special

verdicts that cannot be reviewed on appeal, if any competent evidence was offered to sustain the findings?

2. Our organic law contains the following guaranty:

"In all civil cases, the right of trial by jury shall remain inviolate." Article I, Section 17 of the Constitution.

The fundamental law was amended November 8, 1910, empowering the Supreme Court, in its discretion, to take original jurisdiction in *quo warranto* proceedings. Article VII, Section 2, of the Constitution. The right to a trial by jury thus assured applies only to cases in which the prerogative existed at common law, or was secured by statute, or recognized by decision or rule of court, at the time our constitution was adopted. *Tribou v. Strowbridge,* 7 Or. 156.

3. In order to ascertain if in Oregon at that time the right subsisted by the ancient law was granted by territorial enactment, or conceded by judicial settlement, it is necessary to distinguish between a writ of "*quo warranto*" and proceedings by "information in the nature of *quo warranto,*" and to determine whether at common law a party to a writ of *quo warranto* was entitled to, and could legally demand a jury trial. The ancient writ of *quo warranto* was in the nature of a writ of right which could be invoked by the king against a person who claimed or usurped an office, franchise, or liberty, to inquire by what authority he asserted a right thereto, in order that it might be determined. 3 Black. Com. *262; High, Ex. Legal Rem. (3 ed.) § 592. A judgment on a writ of *quo warranto,* as in the case of other prerogative writs, was conclusive even as against the crown, and the finality of such determination and the length of the process, which was an original writ issuing out of chancery, probably induced the substitution of the more modern method of determining the right invoked by an

information in the nature of *quo warranto,* which was properly a criminal prosecution instituted not only to fine the usurper, but to oust him from an office, franchise, or liberty. 3 Black. Com. *263.

4, 5. In proceedings in courts of England on informations in the nature of *quo warranto,* the right to a trial by jury seems to have been granted by enactment. Thus, by an act of 4 & 5 Will. & M. c. 18, stating that whereas informations had been exhibited against persons for "trespasses, batteries and other misdemeanors," declaring that from and after the first day of the Easter term, in the year 1693, the clerk of the crown in the Court of Kings Bench should not, without express order of the court, receive or file "any information for any of the causes aforesaid;" but that if an information were ordered to be filed, issue thereon were joined, and, "a verdict pass for the defendant," he was to be awarded his costs, unless the judge should certify that there was reasonable cause for exhibiting the information. In construing the language of that act it was held that a usurpation of an office or a franchise was a "misdemeanor" within the meaning of the statute. Cole, Crim. Information & Quo Warranto, *117 (56 Law Lib.)

So, too, another statute (9 Ann. C. 20), regulating proceedings on information in the nature of *quo warranto,* proclaimed that from and after the first day of Trinity term (in the year 1711) in case any person should usurp, intrude into, or unlawfully hold any office or franchise, an information by leave of court might be exhibited against him in the nature of *quo warranto,* and if upon trial such person were found guilty, it was lawful for the court to give judgment of ouster against him, and also to fine him for the usurpations. Cole, Crim. Information & Quo Warranto, *121. By other acts of Parliament it was provided that, if issue were joined on an information in the nature of *quo warranto,* jury process would be

awarded, and either party could obtain a special jury.
Cole, Crim. Information & Quo Warranto, *219.

A clause of our statute seems to have been patterned
after such acts of Parliament, for it provides as follows:

"When a defendant * * against whom an action has
been commenced by any of the causes specified in sub-
division 1 of Section 366, is determined to be guilty of
usurping, or intruding into, or unlawfully holding or
exercising any office or franchise, judgment shall be given
that such defendant be excluded therefrom.    The court
may also in its discretion impose a fine upon the defendant
not exceeding $2,000."    Section 374, L. O. L.

It would appear, from the provision respecting the
amercement which can be inflicted in case of the determ-
ination of the guilt of a party accused of usurpation, that
the enactment last quoted provided for an action on infor-
mation in the nature of *quo warranto,* necessitating a
trial by jury if issue were joined.    In all other cases
specified in our statute, judgment is given upon a determ-
ination of the right (Section 371, L. O. L.), which regula-
tion seems to make such forms of action tantamount to
the ancient common-law writ of *quo warranto.*

A diversity of opinion is to be found in the adjudicated
cases as to whether or not the right to a jury trial existed
at common law of issues joined on writs of *quo warranto.*
In discussing this question Mr. Chief Justice McClure, in
*State* v. *Johnson,* 26 Ark. 281, 290, says:

"Whether the right of trial by jury ever existed as a
matter of right in *quo warranto* is not a matter easily
determined by direct precedent.    The respondent claims
that such is the uniform practice, not only in this country,
but in England, and in support of that position quite a
number of authorities have been submitted to our con-
sideration.    On a careful examination of the authorities
cited, we have found them to apply to informations in
the nature of *quo warranto.*"

Further in the opinion it is observed:

"In information in the nature of *quo warranto,* it is expressly provided by an act of Parliament (3 Geo. II, c. 25) that a jury shall be struck before a proper officer, on the demand of the king or the respondent. This statute was passed for the special purpose and to the end that his majesty's courts, at Westminister, might be provided with juries to try questions of fact. If this right existed before this time, it was certainly a work of supererogation on the part of Parliament to enact the law, and the inference to be drawn from this fact, that, prior to the date of the statute, the issues of fact were tried by the court, even in cases of information in the nature of *quo warranto,* which, at best, is but little more than a summary proceeding to ascertain the right to an office."

It is believed that the weight of authority warrants the declaration that when our Constitution was adopted the right to a jury trial on an issue joined on a writ of *quo warranto* was not recognized by the principles of the common law, nor conferred by enactment or conceded by decision or rule of court. High, Ex. Legal Rem. (3 ed.) § 613; 17 Ency. Pl. & Pr. 480, note 4; *Louisiana, etc., R. Co.* v. *State,* 75 Ark. 435 (88 S. W. 559: 5 Ann. Cas. 637, and notes). *State ex rel.* v. *Lupton,* 64 Mo. 415 (27 Am. Rep. 253) ; *State ex rel.* v. *Doherty,* 16 Wash. 382 (47 Pac. 958: 58 Am. St. Rep. 39). We conclude, therefore, that in an action tantamount to the ancient writ of *quo warranto* the right to a trial by jury does not exist in this State, and this deduction seems to be confirmed by the amendment of our organic law (Const., Article VII, Section 2 of the Constitution, empowering the Supreme Court, which is not authorized to impanel a jury, to take original jurisdiction of *quo warranto* proceedings.

From a casual examination of the case of *State ex rel.* v. *Alt,* 26 Mo. App. 673, it might be thought a different determination was reached, for in a headnote it is stated:

"An action of *quo warranto* is one at law and the

findings of fact, if supported by substantial evidence, are conclusive upon an appellate court."

That cause, however, was an information in the nature of *quo warranto* where the parties were entitled to a jury trial, but, having waived that right, the findings of fact made by the court were properly held to be conclusive.

Considering the case at bar on its merits, plaintiff's counsel argues that errors were committed in receiving, over objection and exception, testimony tending to show that the number of voters residing in the territory April 19, 1909, were less than the number of electors who were registered for the election held in November, 1908. The statute regulating the incorporation of ports contains clauses as follows:

"The judges and clerks appointed by the county court for the preceding general election shall act as judges and clerks of such special election, and the register of voters used at such preceding election shall be used at such special election, and no one but persons authorized to vote within such district at a general election held therein shall be authorized to vote at such special election. * * The polls shall be kept open between the hours provided for in cases of general election, and notice of the time of such special election shall be posted in each polling precinct in which such measure is to be voted upon in like manner as is provided for in cases of general elections." Section 6116, L. O. L.

6. The evidence received at the trial herein shows that at the election held in November, 1908, there were 2,002 votes registered in the several precincts comprising the proposed port. If the testimony admitted had disclosed that any one or more of the persons so enrolled had moved out of the district prior to April 19, 1909, the registration would have been diminished to that extent. The number so enrolled would have been augmented also by testimony showing that qualified electors had moved into the district after November, 1908, or were living

therein at that time but were not registered, and were entitled to vote at the special election.

The testimony, to the introduction of which objection was made, consists of the declarations of witnesses who stated that the number of voters in the district April 19, 1909, was less than at the preceding election, and that more qualified electors had moved out of the territory after November, 1908, than had come into it. No name of any person was given who either moved into or out of the district within the time specified, so as certainly to determine therefrom an increase of, or a reduction in, the number of registered voters.

The finding of fact that the number of qualified electors in the territory involved on April 19, 1909, was approximately 1,950 is not founded on any competent evidence, and errors were committed in admitting the opinions of witnesses on that subject. The finding respecting the approximate number of voters seems expressly to be contradicted by the findings that "on or about the 10th day of April, 1909, actual notice of the time of holding said election was mailed to at least 1,764 registered voters within said territory proposed to be incorporated," and the finding "that the votes sworn in at the port of Coos Bay election in April, 1909, was 309," thus disclosing that the number of qualified electors was 2,073, instead of 1,950, the number so estimated.

7. Testimony was admitted over objection and exception tending to show that the question of the incorporation of the port was discussed at public meetings held in some of the precincts and in newspapers published in the district. The election held April 19, 1909, was special (Section 6116, L. O. L.), and as the statute prescribed the particular manner of giving notice thereof, as hereinafter stated, the method thus provided for is exclusive. *Wright* v. *McMinnville*, 59 Or. 397 (117 Pac. 298). Errors

were therefore committed in admitting evidence of the public meetings, at which the question of incorporating the port was discussed, and of the newspaper comments relating to the same subject. Whether or not the misapplication of the legal principles referred to was prejudicial will depend upon a consideration of the number of ballots cast at the special election when compared with the number of electors who were registered for the preceding November election.

8. Whatever the rule may be in other states, it is settled in Oregon that at a special election the notices thereof, required by the statute to be given, constitute a condition precedent which must be observed in order to validate measures to be voted upon. *Marsden* v. *Harlocker,* 48 Or. 90 (85 Pac. 328: 120 Am. St. Rep. 786) ; *Guernsey* v. *McHaley,* 52 Or. 555 (98 Pac. 158) ; *Wright* v. *McMinnville,* 59 Or. 397 (117 Pac. 298).

9. When, however, from an inspection of the number of votes cast in a precinct at a special election, when compared with the number of registered voters therein at that time, it conclusively appears that no different result could have been possible in the entire district affected by the majority vote, the failure strictly to comply with the requirements of the statute in respect to giving notice will not invalidate the election. *Roesch* v. *Henry,* 54 Or. 230 (103 Pac. 439). The doctrine thus announced proceeds upon the principle that if the votes cast in the precinct, in which the required notice was not given, were rejected, the result of the special election in the whole territory would not possibly be changed.

10. Pursuant to the rule so adopted, attention will be called to the provisions of the general election law, which by proper reference are made a part of the statute authorizing the incorporation of ports. Section 6116, L. O. L. The clauses thus alluded to are, as far as material herein, as follows:

"The county court shall, at the regular term in January preceding a general election, appoint three judges and three clerks of election for each election precinct, to serve for the period of two years." Section 3305, L. O. L.

"In all election precincts in which were cast one hundred and fifty (150) or more ballots at the last general election, * * the county court may * * at said January term, appoint a second or additional board consisting of three judges and three clerks for each precinct, who shall hold their office for two years." Section 3306, L. O. L.

"It shall be the duty of the county clerk, thirty days before any general or presidential election, and at least ten days before any special election, to prepare printed notices of the election and mail two of said notices to each judge and each clerk of election in each precinct; and it shall be the duty of the several judges and clerks to immediately post said notices in public places in their respective precincts." Section 3307, L. O. L.

In the 12 precincts composing the district, more than 150 ballots having been cast in each of three of them, the county court appointed an additional board, consisting of three judges and three clerks for each of such more populous divisions of the county. By computation it will be seen that in the 12 precincts designated there were 72 judges and clerks regularly required and also 18 extra members duly appointed, making 90, each of whom was ordered to post two election notices in his precinct, or 180 notices that should have been put up in the entire district. It will be remembered that the court found that of the number of notices so demanded there had been posted by the judges and clerks only 105; by third parties at their request, 8; by other persons, 9; unaccounted for, 14; and that there was a neglect to put up 44.

11. In elections to incorporate ports, neither the judges nor the clerks are required to make any return of the posting of election notices. *Bennett Trust Co.* v. *Sengstacken,* 58 Or. 333 (113 Pac. 863). This duty never having been imposed by statute, it will be assumed without

deciding the question, that the 14 notices, in respect to which no evidence was offered, were properly presumed by the trial court to have been regularly posted. Section 799, subd. 15, L. O. L. *Wheat* v. *Smith,* 50 Ark. 266, 276 (7 S. W. 161).

The purpose designed to the subserved by the statute in requiring notices of election to be given is to inform legal voters of the time, place, and objects of an election. As found by the trial court, it will be taken for granted, without determining the matter, that though the duty to post such notices has been imposed on judges and clerks of election, their appointment by the county court does not create such a relation of trust and confidence that the obligation resting upon them cannot be legally discharged by other persons. If election notices emanate from the proper source, are issued pursuant to law, afford the requisite intelligence, and have been displayed in public places for the designated time, it would seem to be immaterial who posted them, and for that reason it will be conceded, though not necessary to a decision herein, that the 17 notices that were put up by persons other than the judges and clerks of election were properly posted.

Considering the notices, in proof of posting which the trial court invoked the presumption, and those that were put up by third persons as having been posted by the judges and clerks, the number of notices put up and omitted to be displayed in the several precincts, composing the proposed port, are respectively as follows: Coos City, 8 and 4; Coos River North, 11 and 1; Coos River, 9 and 3; Empire, 10 and 2; Lake, 8 and 4; Marshfield North, 16 and 8; Marshfield South, 22 and 2; Newport, 10 and 2; North Bend, 14 and 10; South Slough, 10 and 2; Summer, 10 and 2; and Ten Mile, 8 and 4. It will be noted that in each of these precincts there was a failure to post the required number of election notices, varying from 1 to 10.

It will be kept in mind that the court found from the

evidence taken that at the election held April 19, 1909, there were 1,234 votes cast, of which 309 were sworn in as having been polled by electors who had not been registered, and that the result of the vote was 992 in favor of the incorporation of the port and 221 against the measure, thereby disclosing that 21 ballots were evidently placed in the boxes without any marks thereon to indicate the choice of the electors. The total number of votes polled being 1,234, of which 309 were sworn in, it will be seen that only 925 ballots were cast by registered voters, and as there were enrolled at that time 2,002 electors, it is quite manifest, if the contradictory finding made by the court be disregarded, that 1,077 registered voters took no part in the special election.

This computation does not bring the case within the principle announced in *Roesch* v. *Henry,* 54 Or. 230 (103 Pac. 439), for it cannot be said with certainty that if the 1,077 voters, who were registered in November, 1908, but did not participate in the special election, had attended and cast their ballots, the result could not possibly have been changed.

The vote upon any measure, determined at a special election, ought not to be disturbed if it can be avoided, and a diligent effort has been made to find, if possible, some way to escape the conclusion which has been forced upon us. In the pioneer days of Oregon it was necessary that notices should have been posted in public places, in order to impart requisite information of pending elections and of other matters in which a party or the public might have been interested. The time has arrived, however, when such notices should be given by being printed in a newspaper, if one be published in the county. By the means suggested, greater publicity would undoubtedly be given, for but few persons ever pause to read posted notices, while nearly every one reads the local papers. The absurdity of requiring 150 election notices to have been

put up is apparent, and in case of a general election the failure to comply with the command of the statute would have been immaterial; but as the election herein was special, and a different result might have been possible, there is no getting away from the determination to which we have arrived and still maintain legal principles which have been solemnly adjudicated. If, however, an easier or more efficient method of imparting the required information, respecting special elections, be desired, the authority must be secured from the legislative department.

It follows that for the errors adverted to the judgment is reversed and the cause remanded for such further preceedings as may be necessary, not inconsistent with this opinion.                    REVERSED: REHEARING DENIED.